In the District Court of the United States
For The District of South Carolina
BEAUFORT DIVISION

RECEIVED
USDC, CLERK, CHARLESTON

2008 AUG 28  A 9: 13

| | | |
|---|---|---|
| **ALLIE M. JAMES,** | ) | Civil Action No. 9:07-0749-MBS-GCK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | **OF THE MAGISTRATE JUDGE** |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I. INTRODUCTION

This case is before the Court pursuant to Local Civil Rule 83.VII.02, D.S.C., concerning

the disposition of Social Security cases in this District, and Title 28, United States Code Section

636(c).  The plaintiff, Allie M. James (the "Plaintiff" or "Claimant"), brought this action

pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain

judicial review of a final decision of the Commissioner of Social Security denying her claim for

disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-

433.[1]

---

[1]    The Social Security Disability Insurance Program, established by Title II of the Act as amended, 42
U.S.C. § 401 *et seq.*, provides Disability Insurance Benefits ("DIB") to disabled persons who have
contributed to the program while employed.  The regulations for determining disability are set forth
at 20 C.F.R. pt. 404.

## II.  BACKGROUND TO THE CLAIM

Plaintiff was born on September 23, 1961 (Tr. 93) and has a high school education.  (Tr. 59)  She worked as a shipping and receiving clerk from 1984 to February 2003.

## III.  ADMINISTRATIVE PROCEEDINGS

Plaintiff was 43 years old at the time of her alleged onset of disability on April 30, 2003.  (Tr. 22)  She filed an application for DIB on April 28, 2004, which was denied initially and upon reconsideration.  (Tr. 33-39)  Plaintiff timely requested a hearing, which was held before Administrative Law Judge Debra Morriss (the "ALJ"), on February 16, 2006 in North Charleston, South Carolina.  Plaintiff was present, and represented by James Callahan, Esquire.  Feryal Jubran, M.A., a vocational expert, also was present at the hearing and testified.  (Tr. 259-294)

### A.    Medical Evidence of Record

On May 10, 2002, Plaintiff jumped down some steps at work, hit her head on the ceiling, and fell.  (Tr. 118)  She was treated at Roper Hospital for a laceration on the right side of her head and low back pain and was released later that day.  (Tr. 118-120)  On May 13, 2002, Plaintiff presented to Harold Nicolette, D.O., with complaints of headaches, low back pain and feeling "shaky."  (Tr. 255)  Plaintiff visited Dr. Nicolette on four occasions that month, complaining of headaches, right ankle pain, back spasms and pain behind her right eye.  (Tr. 153-55)  Examination showed "good" range of motion of the neck with no radicular pain, tenderness of the lumbar paraspinous with "mild" spasms noted; however, range of motion was "grossly" intact, straight leg raising test was normal, and there were no obvious restrictions in

the range of motion of her right ankle with no joint instability noted. (Tr. 255) Dr. Nicolette concluded that Plaintiff had no deficits. (Tr. 255)

In June 2002, Plaintiff was treated by Daniel L. Albenberg, M.D., for complaints of right-sided headaches, spasms in her back, night tremors, leg cramps and "a feeling about her arm associated with some dizziness and [occasional] tremors." (Tr. 126)

In July 2002, Dr. Albenberg noted that Plaintiff's cervical and lumbar sprains were unimproved with conservative treatment and that she was to continue her work restrictions of no lifting greater than 5 pounds, a 15-minute break every two hours, and no workday longer than six hours. (Tr. 124) An MRI of the cervical spine showed no herniation; "some"degenerative changes at C3-4 with mild right neural foraminal narrowing; "some"eccentric degenerative changes at C4-5 and C5-6, causing moderate right neural foraminal narrowing at each level; and "some" degenerative changes at C6-7 with "some mild to moderate" rightneural foraminal narrowing. (Tr. 127).

In August 2002, Plaintiff presented to Steven C. Poletti, M.D., for evaluation of her neck and back pain. (Tr. 205) Physical examination showed "reasonably good motion,"some discomfort with forward flexion, and normal reflexes. (Tr. 205)

Due to Plaintiff's continued complaint of neck and back pain, Dr. Poletti ordered an MRI of the lumbar spine. (Tr. 204) The MRI showed an annular tear at the L4-5 with disc degeneration at L5-S1. (Tr. 203) Dr. Poletti treated Plaintiff with epidural injections. Plaintiff continued to experience pain. (Tr. 200-02) Dr. Poletti performed a discogram which showed severe disc degeneration at L5-S1, concordant pain reproduction at L4-5, and a normal disc at

L3-4.  (Tr. 195)  On April 25, 2003, treatment notes from Dr. Poletti showed that Plaintiff had a positive straight leg raising test.  (Tr. 197)  On June 20, 2003, Dr. Poletti performed a laminectomy and diskectomy at L5-S1, and a lumbar fusion at L5-S1.  (Tr. 192)  Plaintiff's follow-up examination showed that her fusion mass was "coming in well," and that the screws were in adequate position.  (Tr. 190-91)  By September 16, 2003, Dr. Poletti noted that Plaintiff's leg pain has improved and that x-rays of the lumbar spine showed evidence of bone fusion and adequate positioning of interbody and screws.  He recommended that Plaintiff wean herself from her brace.  (Tr. 189)

In October 2003, treatment notes of Dr. Poletti first recorded that Plaintiff was using a cane, and Dr. Poletti told her to "stop this" and to increase to her activities at home.  (Tr.188)  Examination showed a positive straight leg raising test, even though her fusion mass was "coming in solidly" and the screws were in adequate position.  (Tr. 188)  Dr. Poletti recommended that Plaintiff continue with physical therapy.  (Tr. 188)  He opined that Plaintiff was able to continue working in a full-time capacity.  (Tr. 203)

However, on November 25, 2003, Dr. Poletti placed Plaintiff on a no-work restriction for one month (Tr. 187) even though his treatment notes indicated that she was ambulating well without her brace, he was "hopeful that some type of sedentary duty [would] be available to her" and x-rays of the lumbar showed the fusion mass to be well consolidated.  Plaintiff also informed Dr. Poletti that she had been fired from her job.  (Tr. 185)

On January 6, 2004, Plaintiff's fusion was "extremely solid and her x-rays looked "very good," though Plaintiff complained of a burning sensation in her left leg.  (Tr. 184)  Dr. Poletti

stated that no further surgical intervention was necessary. (Tr. 184) Physical therapy notes indicated that Plaintiff's condition had improved. Plaintiff had increased ambulation stability, decreased need to use her cane and was standing and walking up to 30 minutes. (Tr.133)

In February 2004, Plaintiff was medically stable, her x-rays looked "reasonably good," and her fusion mass was consolidated. (Tr. 183) Dr. Poletti opined that Plaintiff had reached maximum medical improvement and assigned a 25 percent disability rating. (Tr. 183) Dr. Poletti further opined that Plaintiff should be on "modified duty" with no constant bending, twisting, pushing or lifting of more than 20 pounds. (Tr. 183)

On April 5, 2004, Plaintiff underwent an independent psychological and vocational evaluation performed by Robert E. Brabham, Ph.D. (Tr. 128-31) Plaintiff reported that she did not have a history of mental health issues or treatment with psychotropic medications, and had never been hospitalized due to a mental health condition. (Tr. 130) She obtained a full scale I.Q. score of 94, which Dr. Brabham opined was consistent with the average range of intelligence. (Tr. 139) On the Wide Range Achievement Test-Revision 3, her reading and spelling scores were at the high school graduate level; however, her arithmetic scores were at the seventh grade level. (Tr. 131) Dr. Brabham diagnosed pain disorder with a general medical condition; generalized anxiety disorder, related to vocational uncertainty; and a depressive disorder, not otherwise specified. (Tr. 130) Dr. Brabham concluded that, in her present condition, Plaintiff could not obtain or maintain gainful employment and that she could only perform such limited task for which no reasonably stable market existed. (Tr. 131)

In May 2004, Dr. Poletti noted that, although Plaintiff continued to complain of pain, he "d[id] not think that she [wa]s totally disabled." (Tr. 180)

On July 2, 2004, George T. Keller, III, M.D., a State agency medical consultant, reviewed the record up to date and found that Plaintiff could occasionally lift/carry up to 20 pounds, frequently lift and carry up to 10 pounds, stand/walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, and occasionally push/pull with her left leg. (Tr. 168) Dr. Keller also found that Plaintiff was limited to occasional climbing of a ramp, stairs, ladder, rope, and scaffold; frequent balancing; and occasional stooping, kneeling, crouching, and crawling. (Tr.169) Dr. Keller found no manipulative, visual, communicative, or environmental limitations. (Tr. 169-71)

On August 4, 2004, Plaintiff presented to Dr. Nicolette, complaining of neck and back pain, and stiffness. (Tr. 249) Examination revealed "some discomfort," diminished range of motion of neck and back, but normal motor and sensory functioning in the arms and legs. (Tr. 249) Later that month, Dr. Poletti wrote a letter on behalf of Plaintiff, stating that she had difficulty walking long distances. (Tr. 179)

In a deposition taken on September 15, 2004, before the South Carolina Workers' Compensation Commission, Dr. Poletti testified that he believed Plaintiff was "functional," and that she was not someone he would recommend to receive Social Security disability. (Tr. 218) Dr. Poletti further testified that, if Plaintiff became more functional, she could lessen her

disability (Tr. 221), but that she should not engage in prolonged sitting, but alternate between sitting and standing. (Tr. 229).

Treatment notes from Dr. Nicolette dated December 7, 2004, indicated that Plaintiff complained of headaches in addition to neck and back pain, and that she requested a disability evaluation. (Tr. 248) Dr. Nicolette told her that he was unsure of what he could do regarding her disability, but suggested that she should see a surgeon about it. (Tr.248)

In a "Treating Physician's Statement For Social Security Disability" form dated January 31, 2005, Dr. Nicolette concurred with Dr. Brabham's April 2004 psychological and vocational evaluation regarding Plaintiff's inability to engage in any work-related activities, even sedentary, and that Plaintiff's disability was a result of her limitation in sitting, standing, and lifting, the effects of pain and pain medication, chronic headaches, and her need to take frequent rest breaks throughout the day. (Tr. 258)

### B. Hearing Testimony

At the administrative hearing on February 2, 2005, Plaintiff testified that any activity intensified her pain, and that she used a cane all the time, except when she was at home. (Tr. 263) She also testified that she could sit and stand for 20 minutes each before needing to change positions, and that she could walk in 10-minutes intervals for about 40 minutes. (Tr. 265, 271) Plaintiff further testified that her migraines were triggered by stress, and that she had them two or three times a week for 8 to 48 hours, but that she was not taking any prescription or cover-the-counter medications for them. (Tr. 267)

Plaintiff stated that she had carpal tunnel syndrome in the left hand, due to using a computer at her previous job. (Tr. 267-68) Plaintiff averred that it was difficult to write with her left dominant hand, but she "tr[ied] to work with it." (Tr. 269) She stated that she was able to draw and do cross stitch for 10 minutes at a time for a total of one hour per week (Tr. 269, 276), that she took her children to school and her husband to work, and that she volunteered her children's school, organizing parties and making copies for about one hour each day. (Tr. 269) However, Plaintiff stated that most of her volunteer work involved making copies while standing for about 20 minutes. (Tr. 273) Plaintiff also testified that she did not have any mental condition that impacted upon her ability to work. (Tr. 271)

### C.    Vocational Testimony

The ALJ also received testimony from Feryal Jubran, a vocational expert. (Tr. 282-93) Jubran was allowed to question Plaintiff for some clarification of her past job duties and asked Plaintiff how long she sat to perform the accounts payable part of her job. (Tr. 283) In response, Plaintiff stated that she sat for 30 to 45 minutes the entire day, and that the most she lifted was 50 pounds. (Tr. 283-84) Jubran described Plaintiff's past relevant work as a shipping and receiving clerk because those were her primary duties, and that she did not perform the accounts payable job "enough to amount to calling her an account payable." (Tr. 284) Jubran testified that Plaintiff's transferable skills included verifying and maintaining records, requisitioning, ensuring shipments were on time, and validating shipments. (Tr. 285)

The ALJ asked Jubran to assume a person of Plaintiff's age, education and work history, who could perform sedentary work that did not require more than occasional climbing of stairs,

stooping, bending, kneeling, twisting, crouching and crawling; no climbing of ropes, ladders, or scaffolding; allowed for a sit/stand option with the need to change position between sitting and standing every 30 to minutes; and did not require continuous use of the left dominant hand for fine fingering.  (Tr. 284, 286-87)  In response to the hypothetical question, Jubran testified that, taking into account transferable skills, such an individual could perform the sedentary, semiskilled jobs of information clerk, Dictionary of Occupational Titles (DOT) # 237.367-022 (720 jobs existing in South Carolina and 184,000 existing in the national economy); order clerk (DOT #249.362-026) (870 jobs existing in South Carolina and 375,000 jobs existing in the national economy) (Tr. 287); and charge account clerk (DOT # 205.367-014) (417 jobs existing in South Carolina and 63,000 jobs existing in the national economy) (Tr. 288).

Jubran also testified that such a hypothetical person could perform the unskilled, sedentary job of machine tender (DOT # 574.685-010) (600 jobs existing in South Carolina and 127,000 jobs existing in the national economy).  (Tr. 288).  Jubran further testified that the sedentary jobs would permit the hypothetical person to use a cane on an as-needed basis for ambulation (Tr. 287) and that, although the DOT did not speak of a sit/stand option, she based her responses on vocational expertise (Tr. 290).

## IV.  THE COMMISSIONER'S FINDINGS

In making her determination that the Plaintiff was not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1.   The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's degenerative disc disease and migraine headaches are considered "severe" based on the requirements in the Regulations (20 CFR § 404.1520(c)).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P of Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the residual functional capacity: sedentary work activity (as defined by the Commissioner of the Social Security Administration) requiring no more than occasional stair climbing, stooping bending, kneeling, twisting, crouching, crawling or pushing/pulling; not requiring the climbing of ropes/ladders/scaffolding; allowing a sit/stand option with need to change positions every 30 to 45 minutes; not requiring continuous use of the left dominant hand for fine fingering; and allowing use of a cane on an as needed basis for ambulation.

7.    The claimant is unable to perform any of her past relevant work.  (20 CFR § 404.1565).

8.    The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563)

9.    The claimant has a "high school (or high school equivalent) education" (20 CFR § 404.1564).

10.    The claimant has transferable skills from her past relevant work as outlined in the decision.

11.    The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 404.1567).

12.    Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 201.22 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs are cited in the decision.

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(g)).

(Tr. 27-28)

## V.  SCOPE OF REVIEW

Under the Social Security Act, 42 U.S.C. § 405(g), this Court's scope of review of the

Commissioner's "final decision regarding disability benefits is limited to determining whether

the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).

The Court's scope of review is specific and narrow. It does not conduct a *de novo* review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405(g); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Teague v. Califano*, 560 F.2d 615, 618 (4th Cir. 1977). Such evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Shivey v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). It is the duty of the ALJ reviewing the case, and not the duty of the Court, to make findings of fact and resolve conflicts in the evidence. *Hays*, 907 F.2d at 1456. In reviewing for substantial evidence, the court does not weight conflicting evidence, make credibility determinations, or substitute its judgment for that of the agency. *Id.* If substantial evidence supports the Commissioner's decision that a claimant is not disabled, the decision must be affirmed. *Blalock*, 483 F.2d at 775.

## VI. THE APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a). Disability is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can expected to result in death or which has lasted or can be expected to last for at least 12 continuous months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions that are to be asked during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a; *Heckler v. Campbell*, 461 U.S. 458 (1983); *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981). The five questions are:

> (1) Whether the claimant is engaged in substantial gainful activity as defined in Sections 404.1510, 404.1571 et seq. If such determination is affirmative, no disability will be found. 20 C.F.R. § 404.1520.

> (2) Whether the claimant's impairments meet the durational requirement (Section 404.1509), and are severe (Section 404.1520(c)). If they do not meet those requirements, no disability will be found. 20 C.F.R. §§ 404.1509, 404.1520(c).

> (3) Whether the claimant has an impairment which meets or medically equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1) (the "Listing of Impairments") 20 C.F.R. § 404.1520(d). If one of the listings is met, disability will be found without consideration of age, education or work experience. 20 C.F.R. § 404.1520(d).

> (4) Whether the claimant has an impairment which prevents past relevant work. 20 C.F.R. § 404.1520(e).

> (5) Whether, in light of vocational factors such as age, education, work experience and RFC, the claimant is capable of other work in the national economy. The claimant is entitled to disability only if the answer is "no."

20 C.F.R.§ 404.1520(f).

An individual may be determined not disabled at any step if found to be: gainfully employed, not severely impaired, not impaired under the Listing of Impairments, or capable of returning to former work. In such a case, further inquiry is unnecessary. If, however, the claimant makes a showing at Step Four that return to past relevant work is not possible, the burden shifts to the Commissioner to come forward with evidence that the claimant can perform alternative work and that such work exists in the national economy. *English v. Shalala*, 10 F.3d

1080 (4th Cir. 1993); *Harper v. Bowen*, 854 F.2d 678 (4th Cir. 1988); *Coffman v. Bowen*, 829 F.2d

514 (4th Cir. 1987). The Commissioner may meet this burden by relying on the

Medical-Vocational Guidelines (the "Grids") or by calling a vocational expert to testify. 20

C.F.R. § 404.1566. The Commissioner must prove both the claimant's capacity and the job's

existence. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

## VII. ANALYSIS OF THE ALJ'S DECISION

At the first step of the sequential evaluation process, the ALJ found that the Plaintiff had

not engaged in substantial gainful activity since her alleged onset of disability. (Tr. 27, Finding

2) At the second step, the ALJ found that Plaintiff's degenerative disc disease and migraine

headaches were "severe" impairments. (Tr. 27, Finding 3) At the third step, the ALJ found that

Plaintiff's impairments did not meet or equal one of the impairments listed in the Listing of

Impairments. (Tr. 27, Finding 4) At the fourth step, the ALJ found that Plaintiff's allegations

regarding her limitations were not totally credible. (Tr. 27, Finding 5).

The ALJ found Plaintiff was unable to perform her past relevant work (Tr. 27, Finding 7)

but determined that Plaintiff retained the residual functional capacity to perform the following:

> The claimant has the residual functional capacity: sedentary work activity (as defined by the Commissioner of the Social Security Administration) requiring no more than occasional stair climbing, stooping bending, kneeling, twisting, crouching, crawling or pushing/pulling; not requiring the climbing of ropes/ladders/scaffolding; allowing a sit/stand option with need to change positions every 30 to 45 minutes; not requiring continuous use of the left dominant hand for fine fingering; and allowing use of a cane on an as needed basis for ambulation.

(Tr. 27, Finding 6)

At the fifth step of the sequential evaluation process, the ALJ accepted the VE's testimony

that a person of Plaintiff's age, with her educational background, work experience and residual

functional capacity could perform work as an information clerk, a charge account clerk, and a

machine tender. (Tr. 28, Finding 12) Because the ALJ's hypothetical question to the VE

reflected an accurate account of Plaintiff's limitations that were supported by the record and

accepted by the ALJ, the ALJ was entitled to consider the opinion of the VE as reliable evidence

of the existence of work in the regional economy that Plaintiff could perform. *See Mickles*, 29

F.3d at 929 n.7.

## VIII.  PLAINTIFF'S OBJECTIONS

The Plaintiff raises four objections in her Brief:

I.      The ALJ abused her discretion by not performing a proper listing analysis;

II.     The ALJ failed to consider whether the Plaintiff's combined impairments are of equal medical significance to a listed impairment;

III.    The ALJ conducted a flawed credibility analysis; and

IV.     The ALJ did not properly consider the medical opinion of Plaintiff's treating physician.

## IX.  DISCUSSION

I.      **The ALJ abused her discretion by not performing a proper listing analysis.**

The Plaintiff first contends that the ALJ erred in failing to find that her condition met the

criteria of Listing 1.04, Disorders of the spine, 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04.  That

Listing reads, in relevant part:

> **1.04 Disorders of the spine** (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging,

manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

It is undisputed between the parties that the ALJ must compare each of the listed criteria to the evidence of the claimant's symptoms. *See Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986). Generally, "[f]or a claimant to show that [his] impairment matches a Listing, [she] must meet all of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Importantly, the ALJ must first identify the relevant listed impairments. *Cook*, 783 F.2d at1173. "He should then [compare] each of the listed criteria to the evidence of [the claimant's] symptoms." *Id.*; see also 20 C.F.R. § 416.926(a). "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination." *Cook*, 783 F.2d at 1173.

The Defendant, however, argues that Plaintiff has not, herself, demonstrated that she meets each criteria of the Listing, such that the ALJ's error, if any, resulted in an incorrect disability determination. In a sense, Plaintiff concedes as much, when she states that "[i]t may be true that the claimant did not meet every single aspect of the listing." (Pl. Reply Brief at 4). Instead, the Plaintiff contends that the technical failure of the ALJ to perform the analysis is sufficient to justify remand.

It is well settled, however, that an ALJ's decision should be affirmed where an error is harmless, if "he would have reached the same conclusion notwithstanding [the] initial error." *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994). Even if the ALJ, therefore, failed to

perform the Listing analysis in all its necessary detail, that oversight is of no moment if the Plaintiff cannot produce evidence and argument that she would have met the criteria even if he had.

To that end, the Plaintiff urges that the evidence, in fact, portends of more than just a technical failure of the ALJ to conduct the required Listing analysis. The Plaintiff has put forward evidence that she has either herniated nucleus pulposus or degenerative disc disease, both of which are expressly identified conditions in the Listing:

**Herniated nucleus pulposus:**

- October 24, 2002, MRI was consistent with annular tearing at the L4-5 level with degeneration at L5-S1. (Tr. 203)

- April 25, 2003, discogram showed severe disc degeneration at L5-S1, with concordant pain reproduction at L4-5 (Tr. 195)

**Degenerative disc disease:**

- July 11, 2002 MRI showed degenerative disc disease. (Tr. 123)

- October 7, 2002, MRI showed degenerative changes. (Tr. 209)

- On January 22, 2003, Dr. Poletti noted that Ms. James had multi-level disc degeneration. (Tr. 199)

- April 25, 2003, discogram showed severe disc degeneration at L5-S1, with concordant pain reproduction at L4-5. (Tr. 195)

The Listing, however, requires that the plaintiff demonstrate conditions "resulting in compromise of a nerve root . . . or spinal cord. **With** . . . "nerve root compression . . . spinal arachnoiditis . . . or lumbar spinal stenosis." Listing 1.04 (emphasis added). The Defendant argues that

notwithstanding any evidence of nucleus pulposus or degenerative disc disease, Plaintiff has come forward with no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis. If Plaintiff's alleged nucleus pulposus or degenerative disc disease is accompanied by one of these three conditions, the Plaintiff has not explained it or directed the Court to evidence from which it could be deduced.

Although it was certainly the ALJ's responsibility to articulate his reasoning in the first instance, on appeal the Plaintiff bears the burden of demonstrating that the outcome would have been different but for the error. *See, e.g., Smith v. Barnhart*, 2005 WL 1785273, at *13 (W.D. Wis. July 27, 2005) ("Although I recognize that the commissioner bears the burden of proof at step five, plaintiff's failure to adduce any evidence to show that the commissioner's error is not harmless bolsters the conclusion that a remand for a new step five determination would not affect the outcome of this case."); *Zeno v. Barnhart*, 2005 WL 588223, at * (E.D. Tex. Feb. 4, 2005) ("Hence, plaintiff has not in any event satisfied her burden to demonstrate prejudice arising from the alleged error, and the court-in harmless error analysis-cannot fairly conclude that the result could have changed had ALJ Marcy engaged in a more explicit analysis of medication side effects."); *Slaymaker v. Barnhart,* 2005 WL 273247, at *3 (D. Utah Feb. 2, 2005) ("However, Plaintiff has failed to specify which listing her impairments equaled and how her impairments equaled that listing. Plaintiff has made no effort to show the Court how the cumulative effect of her impairments is medically equivalent to a listed impairment and thus how she was prejudiced by any error on the ALJ's part . . . ."); *see also St. Anthony v. U.S. Dep't of Health and Human Servs.,* 309 F.3d 680, 691 (10th Cir. 2002) (explaining that "the party challenging the action below bears the burden of establishing that the error prejudiced the party"). It is not enough for

the Plaintiff to simply identify the alleged error without explaining how the outcome might have been different in its absence.

The ALJ found that the Plaintiff failed to meet the requirements of Listing 1.04 because he rejected that the evidence established an inability to ambulate effectively, *see* Listing 1.04(C). (Tr. 24.) While the Plaintiff has argued that evidence exists that she could ambulate effectively as defined by Listing 1.00(B), the Plaintiff has failed to demonstrate that the evidence, relied upon by the ALJ to conclude otherwise, was not substantial; in fact, she has not really even argued as much. Specifically, the ALJ found that the "claimant was able to walk and stand for 30 minutes at a time." (Tr. 24) The Plaintiff makes no serious rejoinder to that finding. To the extent Plaintiff has pointed to other evidence in the record that could have supported a different outcome, it is of no moment; it was the ALJ's duty to weigh the relevant evidence, to resolve material conflicts in the record, and to decide the case accordingly. *Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Blalock*, 483 F.2d at 775; *Millner v. Schweiker*, 725 F.2d 243, 245 (4th Cir. 1984) ("[I]t is immaterial that eight medical witnesses disagreed with the ALJ's conclusion, provided that one such witness gave sufficient probative evidence.").

Moreover, Plaintiff has not identified for the Court evidence that she meets the criteria of the other subsections, either 1.04(A) or (B). Accordingly, the Court is constrained to reject the Plaintiff's appeal and request for remand on the basis of the ALJ's Listing Analysis.

II.     **The ALJ failed to consider whether the Plaintiff's combined impairments are of equal medical significance to a listed impairment.**

The Plaintiff next contends that "[n]owhere in the written decision was there an expressly analyzed conclusion as to why the combined effect of Ms. James's numerous impairments did not render her disabled." (Pl. Brief at 20). To that end, Plaintiff recites evidence suggesting that she

would not be able to perform work of a light or sedentary nature due to the combined effect of her impairments. The Plaintiff also complains that the ALJ failed to consider evidence of her neck pain, left arm and hand pain, and pain disorder.

First, for all the reasons recited above, Plaintiff cannot prevail on this objection because she has not presented evidence that the combined effects of her impairments would equal any Listing. The United States Supreme Court has stated, "For a claimant to qualify for benefits by showing that his **unlisted impairment, or combination of impairments**, is 'equivalent' to a listed impairment, he must present medical findings equal in severity **to all the criteria for the one most similar listed impairment**." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis added) (quoting 20 C.F.R. § 416.926(a)). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Id.* In other words, the combination of impairments does not meet a Listing simply by virtue of the overall functional impact of those impairments. The Plaintiff must still demonstrate how the impairments, when taken together, meet the specific criteria of the Listing in question.

As discussed above, Plaintiff has failed to so demonstrate on appeal. Even if the ALJ did not properly consider evidence of Plaintiff's neck pain, left arm and hand pain, and pain disorder, in concert with her depression, headaches, anxiety, and degenerative disc disease, Plaintiff has made no attempt to demonstrate how such consideration would have demonstrated that the criteria of Listing 1.04 were satisfied. Instead, she has generally put forward evidence that her overall functional level was substantially diminished by the combination of such impairments. (Tr. 128-31, 224, 230, 233, 258) That is not sufficient. *See Sullivan*, 493 U.S. at 531. Therefore,

any error of the ALJ in considering or explaining the combined effects of Plaintiff's impairments is harmless, in the absence of evidence that the outcome would have been different. *See Mickles*, 29 F.3d at 921.

In fact, Plaintiff is wrong that the ALJ did not make any express analysis of the combined effect of the impairments at step three. As the defendant notes, the ALJ expressly stated that he had considered Plaintiff's severe impairments "singly" and "in combination" and found that they did not meet any of the Listings. As far as the Court can tell, nothing more is required. *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (finding that where the decision addressed the claimant's various impairments, there was "nothing to suggest they were not properly considered" in combination). Notwithstanding, the ALJ was more express in his analysis. He considered much of the evidence cited by Plaintiff and other evidence of limitations due to pain (Tr. 23-24) and he further expressly noted his consideration of the combined effects of Plaintiff's headaches, anxiety, and depression, *id*. at 24. As the ALJ properly identified, discussed, and evaluated Plaintiff's impairments in combination when determining her ability to work, the undersigned finds no error.

The ALJ's treatment could have been more thorough. It is not apparently erroneous, however. And, as discussed above, Plaintiff has not demonstrated that the combined effects of her impairments meet the criteria of Listing 1.04.

### III.    The ALJ conducted a flawed credibility analysis.

Next, Plaintiff contends that the ALJ failed to properly assess the credibility of her subjective complaints of pain. Specifically, Plaintiff alleges that the ALJ failed to apply the proper analytical framework. The Court agrees that the ALJ did not make the proper analysis.

Federal regulations set forth at 20 C.F.R. §§ 416.929(a) and 404.1529(a) provide the authoritative standard for the evaluation of pain in disability determinations. *See Craig v. Chater*, 76 F.3d 585, 593 (4th Cir. 1996). Under these regulations, "the determination of whether a person is disabled by pain or other symptoms is a two-step process." *Id.* at 594. First, "there must be objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* at 591 (quotation and emphasis omitted). This threshold test "does not . . . entail a determination of the 'intensity, persistence, or functionally limiting effect' of the claimant's asserted pain." *Id.* at 594. Second, and only after the threshold inquiry has been satisfied, "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated." *Id.* at 595. When the ALJ fails to "expressly consider the threshold question" and instead proceeds "directly to considering the credibility of [the] subjective allegations of pain," remand is warranted. *Id.* at 596.

It is critical to proceed through the steps in their proper order, because "once objective medical evidence establishes a condition which could reasonably be expected to cause pain of the severity a claimant alleges, those allegations may not be discredited simply because they are not confirmed by objective evidence of the severity of the pain[.]" *Id.* at 593. Stated differently, once an ALJ concludes that an impairment could reasonably be expected to produce the pain alleged, he ought to view any inconsistency or defect in the plaintiff's subjective testimony through a more discriminating lens because the plaintiff's subjective allegations, at that point, are consistent with the objective expectations.

It is indisputable that the ALJ failed to address the first step – whether or not the Plaintiff's back pain could objectively produce the kind of pain alleged. In fact, the ALJ exhibits no awareness of the required analytical framework, not even with inclusion of boilerplate legal citations. Instead, the ALJ simply concluded that "the claimant's testimony [was] not fully credible given that the medical record shows that the claimant has only mild to moderate degenerative disc disease with mild limitations in range of motion and continued pain." (Tr. 24.) After this conclusory statement, the ALJ essentially proceeds to step two, analyzing the functionally limiting effects of Plaintiff's pain. *Id.*

The analysis at step one requires that the ALJ determine whether the claimant has produced medical evidence of a "medically determinable impairment which could reasonably be expected to produce . . . . the actual pain, **in the amount and degree**, alleged by the claimant." *Craig*, 76 F.3d at 594 (emphasis added). In other words, the analysis demanded by *Craig* requires something more nuanced than a summary conclusion. Here, the ALJ makes no attempt to explore what kind of pain might be reasonably expected of Plaintiff's conditions. The ALJ has not identified any specific symptoms alleged by Plaintiff which one might anticipate her impairments would produce and certainly has not considered whether the symptoms, in the "same amount and degree" would be reasonably foreseeable. *See Craig*, 76 F.3d at 594.

The ALJ's credibility treatment did not advance the purposes of the analysis outlined in *Craig* and prejudiced Plaintiff to the extent the ALJ only focused on the perceived limitations caused by the alleged pain. If the ALJ determines that Plaintiff's conditions would typically produce a certain threshold or quality of pain, it becomes more difficult to discount her subjective allegations to the extent they are consistent with those objective expectations.

On remand, the ALJ should apply the analysis as described above.

**IV.    The ALJ did not properly consider the medical opinion of Plaintiff's treating physician.**

Lastly, Plaintiff complains that the ALJ failed to consider and address the opinions of Drs. Harold Nicolette, a treating physician, and Robert E. Brabham, an examining physician.

Dr. Brabham, a consultative examiner, assessed Plaintiff on April 19, 2004 with a psychological and vocational evaluation. (Tr. 128-131) Dr. Brabham reported that complications would arise as a direct result of the Plaintiff's pain with nearly any exertion. *Id.* Plaintiff would not be able to work as part of a production team, for example, due to her inability to either sit or stand in one position for long periods of time without experiencing pain on a regular, sustained basis. *Id.* Dr. Brabham found that her need to "rest" during the day could not be reasonably accommodated in a routine work environment. Ultimately, Dr. Brabham opined that Plaintiff, in her present condition, could not obtain or maintain gainful employment and she could now only perform such limited tasks for which no reasonably stable market existed. *Id.*

Plaintiff initially saw Dr. Nicolette on May 13, 2002, for medical care after her work accident. Dr. Nicolette completed the Treating Physician's Statement for Social Security Disability on January 31, 2005. (Tr. 258) Dr. Nicollette concurred with Dr. Brabham that the medical findings and symptoms summarized by Dr. Brabham (including subjective symptoms described by the patient) were consistent with Plaintiff's medical history. *Id.* Dr. Nicolette also agreed with the severity of the symptoms as described by Dr. Brabham. *Id.* In addition, Dr. Nicolette agreed with Dr. Brabham's conclusion that the claimant was not employable on a full-time basis in any type of regular job because of the combination of impairments. *Id.*

In the Fourth Circuit, a treating physician's opinion is entitled to great weight; however, it may be disregarded if persuasive contradictory evidence exists to rebut it. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). The Commissioner need not give controlling weight to the treating source's opinion if it is inconsistent with substantial evidence in the case record, and is not well supported by clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1527(d)(2). The Fourth Circuit has stated repeatedly that the evaluation and weighing of medical opinions will be conducted pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006); citing Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) in turn citing 20 C.F.R. § 404.1527 (2005). Although the treating physician rule does not require that the opinion of a treating physician be granted controlling weight, the ALJ has discretion to accord it lesser weight only if it is not well-supported by clinical evidence or is inconsistent with other substantial evidence in the record. *See Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).

To the extent Plaintiff complains that the opinions of Dr. Nicollette and Brabham were simply not considered by the ALJ, she is in error. As Defendant point out by Brief, both opinions were discussed in some measure by the ALJ. (Tr. 23 (Nicolette), 24 (Brabham)) Moreover, the ALJ explained his reasons for rejecting Dr. Nicollette's opinion in favor of Dr. Poletti's. (Tr. 23)

The Plaintiff argues, however, that the ALJ failed to designate the weight accorded each physician. It is certainly true that he was required to do so in regards to Dr. Nicollette, 20 C.F.R. § 404.1527(d), and did not. The ALJ did, however, indicate that he had given Dr. Poletti's

opinion more evidentiary weight than Dr. Nicollette's, considering Dr. Poletti's expertise in the field of orthopedics. (Tr. 23) This conclusion necessarily implies the weight given Dr. Nicollette's opinion, in a relative sense. Moreover, as stated, the ALJ did discuss his view of Dr. Nicollette's opinion, generally. (Tr. 23) While Plaintiff has set forth an argument as to why Dr. Poletti's ultimate opinion should have been discounted, she has never really contested the propriety of the ALJ's decision to accept Dr. Poletti's testimony that Plaintiff could alternate between sitting and standing, and therefore remained capable of performing some work.

The Court would not recommend remand based upon the ALJ's treatment of Drs. Nicollette's and Brabham's opinions. If, however, the district court agrees with the recommendation to remand, based on the ALJ's credibility determination, the undersigned would further recommend that the ALJ additionally clarify his treatment of these physician opinions and the weight ascribed them.

## RECOMMENDATION

Based upon the foregoing, **it is recommended that the Commissioner's decision be vacated, and this case remanded, for proceedings consistent with this Report and Recommendation.**

GEORGE C. KOSKO
UNITED STATES MAGISTRATE JUDGE

August 28, 2008

Charleston, South Carolina